UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                              Plaintiff,

            v.

RICARDO BAILEY,

                              Defendant.
_____

REPORT & RECOMMENDATION

15-CR-6082G

## PRELIMINARY STATEMENT

By Order of Hon. Frank P. Geraci, Jr., Chief United States District Judge, dated June 5, 2015, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 98).

On June 4, 2015, the grand jury returned an indictment against defendant Ricardo Bailey ("Bailey").  (Docket # 97).  Count One of the indictment charges Bailey with conspiring with Edward Mighty, Seymour Brown, Andre Taylor, Robert Wilson, Kenneth Harper, Christopher Samuels, and others between October 2014 and February 10, 2015, to possess with the intent to distribute and to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846.  (*Id.*).  The second count of the indictment charges Bailey with using and maintaining the premises at 54 Strong Street, Rochester, New York, for the purpose of manufacturing and distributing cocaine, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2.  (*Id.*).  Count Three charges Bailey with possessing a firearm in furtherance of the drug trafficking crimes charged in Counts One and Two, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.  (*Id.*).  Count Four

charges Bailey with possessing with intent to distribute 500 grams or more of cocaine on or about February 10, 2015.  (*Id.*).

Currently pending before this Court are various pretrial motions.  (Docket ## 111, 112, 119, 140, 151, 156).  This report and recommendation addresses only his motion to suppress wiretap evidence (Docket ## 111, 119).  The remaining motions will be addressed in a subsequent decision.

## FACTUAL BACKGROUND

### I.    Wiretap Applications

The charges against Bailey resulted from a lengthy investigation that included interception of communications between various individuals pursuant to multiple wiretap orders.  (*See*, *e.g.*, Docket # 115-18 at 6-11).  The majority of those orders were issued by Monroe County Court Judge Vincent Dinolfo.  In this case, Bailey challenges three of those orders:

1. An order dated January 5, 2015, authorizing the interception of oral and text communications over mobile telephone number 646-842-5157, believed to be used by Edward Mighty ("Mighty");

2. An order dated January 14, 2015, authorizing the interception of oral and text communications over mobile telephone number 585-615-9785, used by an unknown male; and

3. An order dated January 26, 2015, authorizing the interception of oral and text communications over mobile telephone number 347-968-3130, believed to be used by Garfield Bourne ("Bourne"), also known as "Chin."

(Docket ## 115-1; 115-4; 115-7).

On April 18, 2016, Bailey submitted an affidavit to address his standing to challenge particular wiretaps, including the three wiretaps identified above.[1]  (Docket # 132). His affidavit also identified two additional wiretap orders relating to target numbers 585-474-2462 and 347-993-3581 pursuant to which his communications were intercepted, although his submissions do not contain any specific challenges to those wiretap warrants.  Thus, they are not addressed herein.  Bailey's submissions also discuss two other wiretap orders relating to target numbers 347-753-6469 and 347-867-9794 (Docket # 111 at 49-55), but his April 18, 2016, affidavit does not allege that he was intercepted over these numbers (Docket # 132), and thus he has not established standing to challenge them.  *See United States v. Santiago*, 185 F. Supp. 2d 287, 288 (S.D.N.Y. 2002) ("[defendant] has not provided the [c]ourt with an affidavit or sworn testimony that he was overheard on the allegedly unlawful wiretap[;] [a]s a result, he has no standing to contest the legality of the wiretap or evidence that was produced from it").

In issuing the warrants, Judge Dinolfo concluded that probable cause existed to believe that evidence of the following crimes would be obtained through use of the eavesdropping warrants:

1. Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.16;

2. Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.39;

3. Criminal Possession of a Controlled Substance in the Fourth Degree, in violation of New York Penal Law § 220.09;

4. Criminal Possession of a Controlled Substance in the Fifth Degree, in violation of New York Penal Law § 220.06;

---

[1]  During oral argument on April 7, 2016, the government conceded that Bailey has standing to challenge any wiretap provided he establishes that at least one of his conversations was intercepted over that wiretapped number.  (Docket # 130).

    5.   Criminal Sale of a Controlled Substance in the Fifth Degree, in violation of New York Penal Law § 220.31; and

    6.   Conspiracy to commit the above-listed crimes.

(Docket ## 115-1 at 2-3; 115-4 at 2-3; 115-7 at 2-3).

      Affidavits in support of the applications for the challenged wiretaps were submitted by Edmond Bernabei ("Bernabei") and Myron Moses ("Moses"), investigators employed by the Rochester Police Department ("RPD").  (Docket ## 115-3; 115-6; 115-9).  Specifically, Bernabei signed an affidavit dated January 5, 2015, in support of the first wiretap identified *supra* on page 2; Moses signed affidavits dated January 14, 2015, and January 26, 2015, in support of the second and third affidavits.  (*Id.*).  Many of the sections of the three affidavits are virtually identical, namely, the sections captioned, "Investigation to Date," "Goals," "Exhaustion of Normal Investigative Techniques," "Confidential Informants," "Surveillance," "Undercover Officers," "Search Warrants," "Grand Jury," and "Advanced Digital/Audio Collection System by Sytech."  (*Id.*).  The sections summarizing the probable cause to believe that the target telephone number would reveal evidence of the specified drug crimes are different.  (*Id.*).

      In their affidavits, Bernabei and Moses indicated that they were involved in an ongoing investigation of narcotics trafficking, which they summarized; they also incorporated by reference approximately twenty wiretap authorization and extension applications and orders. (Docket # 115-3 at 5-7; 115-6 at 5-8; 115-9 at 5-8).  They also affirmed that their work experience included participation in prior successful investigations of drug distribution networks, which involved monitoring of phone lines, execution of search warrants, and participation in controlled purchases and surveillance.  (Docket ## 115-3 at ¶ 2; 115-6 at ¶ 2; 115-9 at ¶ 2). Bernabei and Moses stated that, as a result of their experience, they were familiar with the

4

"jargon" and tactics used by narcotics traffickers to disguise drug trafficking activities.  (Docket ## 115-3 at ¶ 3; 115-6 at ¶ 3; 115-9 at ¶ 3).  Throughout the affidavits, Bernabei and Moses included transcripts or excerpts of transcripts of intercepted phone conversations, along with their interpretations of the substance of those communications.  According to the investigators, their interpretations derived from their training, experience, and knowledge of the ongoing investigation.  (Docket ## 115-3 at ¶¶ 24, 26, 28, 32; 115-6 at ¶¶ 28, 30, 33, 35, 37; 115-9 at ¶¶ 29, 31, 33, 35, 37, 39).

According to Bernabei and Moses, the investigation had revealed that an individual named Mighty and an unknown male utilizing target number 585-615-9785 operated a drug trafficking ring that supplied cocaine to drug trafficking partners Kenneth Harper ("Harper") and Robert Wilson ("Wilson").  (Docket ## 115-3 at ¶ 21; 115-6 at ¶ 25; 115-9 at ¶ 26).  According to Moses, the investigation suggested that the drug ring obtained narcotics from Bourne, also known as "Chin," who utilized target number 347-968-3130.  (Docket # 115-9 at ¶ 26).

Bernabei and Moses identified the goals of the investigation to include gathering sufficient evidence "to disable and dismantle the vertical distribution network of narcotics that extends around the target individuals," arresting and prosecuting Mighty, Bourne, and the unknown male using target number 585-615-9785; identifying other members of the drug distribution conspiracy, including the suppliers and distributors; identifying the times and locations of communications between Mighty, Bourne, and others in order to facilitate surveillance; and, identifying physical evidence of the drug conspiracy operation.  (Docket ## 115-3 at ¶¶ 33-34; 115-6 at ¶¶ 39-40; 115-9 at ¶¶ 40-41).

Their affidavits further provided the basis for the investigators' belief that normal investigative techniques had not and likely would not accomplish the goals of the investigation or were otherwise too dangerous to employ.  (Docket ## 115-3 at ¶¶ 35-48; 115-6 at ¶¶ 40-51; 115-9 at ¶¶ 42-53).  They explained that although interviews of a confidential informant and surveillance had assisted in identifying some targets and some stash houses, those methods had not led to a full understanding of the organization.  (*Id.*).  According to Bernabei and Moses, they had discussed their investigation with members of each major law enforcement organization in Monroe County and none had access to any confidential informants who could engage in a proactive role in the investigation.  (*Id.*).  They also stated that witnesses and victims often feared retaliation and were reluctant to assist law enforcement agents.  (*Id.*).

The investigators reported that although surveillance efforts had assisted in identifying potential targets and locations of drug-related activity, surveillance was limited to "drive by" or "moving" surveillance.  (*Id.*).  They explained that the target locations were located in residential neighborhoods, which limited the investigating agents' ability to engage in long-term stationary surveillance without detection.  (*Id.*).  The investigators also explained that members of the network typically employed lookouts to alert others of law enforcement's perceived presence.  (*Id.*).  Further, attempted surveillance of a male who had not been identified revealed that he drove cautiously and employed surveillance-avoidance measures.  (*Id.*).

According to the investigators, the confidential informant had limited information about Mighty's drug network and was not in a position to introduce an undercover officer to Mighty, Bourne, or other members of the network.  (*Id.*).  They also stated that although search warrants would likely uncover contraband, they would be ineffective in determining the identities and roles of coconspirators and providing evidence of the vertical structure of the

network.  (*Id.*).  Finally, they opined that a grand jury investigation would not likely yield

information without compromising the secrecy of the investigation.  (*Id.*).

### January 26, 2015, Wiretap[2]

As indicated above, the January 26, 2015, wiretap authorized interception of

communications over mobile telephone number 347-968-3130, which was believed to be used by

Bourne.  In support of the application for the warrant, Moses summarized evidence obtained

through the investigation, including information that Bourne used that phone to further the drug

operation.  (Docket # 115-9).

According to Moses, on January 10, 2015, the following phone call between

Wilson and Harper was intercepted:

Wilson:     Yo?
Harper:     Yeah that n****[3] clueless man, he don't know what to do man.  He
            talking about he gonna get with n***** tomorrow chop it up with
            n***** about that shit man.  That's why better off not fucking with
            n***** man.  I don't know.  I don't know.  I aint got time for that
            shit man.  That shit wack.
Wilson:     That shit all the way wack.
Harper:     I'm waiting for wifey to come pick me up man I'm about to get
            with her.  Tabooly he talking about he's about to burn it up, why
            he about to burn up what his [unintelligible].
Wilson:     Yeah, he's talking about what time he's coming back, he's trying
            [unintelligible]
Harper:     Shit I n****, shit, I was trying to chill for a minute.  And if I do
            come back that shit gonna be
Wilson:     What you about to do?
Harper:     Late, late late.  That shit crazy man.
Wilson:     We need to [unintelligible]

---

[2] Bailey raises several challenges to the wiretaps, including that the supporting affidavits did not establish
that traditional investigative techniques had been or likely would be unsuccessful.  (Docket ## 111 at 55-62; 119 at
19-20).  Bailey also challenges the January 26, 2015, wiretap on the grounds that the warrant was unsupported by
probable cause, but has not raised a probable cause challenge with respect to the January 5, 2015, and January 14,
2015, wiretaps.  (Docket ## 111 at 49-51, 53-54; 119 at 18-19, 23).  Thus, the description of the information in
earlier wiretap applications is limited to that relevant to the analysis of "necessity," while the description of the
January 26, 2015, wiretap is more extensive as necessary to address the additional probable cause challenge.

[3] The transcripts are quoted verbatim, including the use of profanity and slang.  The one exception is the
appearance of a racial epithet, which the Court has indicated through the use of asterisks.

| | |
|---|---|
| Harper: | This shit wack man |
| Wilson: | Bullshit |
| Harper: | Well I don't know man |
| Wilson: | She left the car running right?  [to someone offline] |
| Harper: | Huh? |
| Wilson: | Damn |
| Harper: | Alright man shit, just hit me then man |
| Wilson: | Alright |

(*Id.* at ¶ 38).  According to Moses, based upon his training, experience, and knowledge of the

investigation, Harper relayed to Wilson his conversation with their cocaine source.  (*Id.*).  Harper

told Wilson that the source had indicated that he would get back to Harper the following day.

(*Id.*).  Harper expressed frustration with how the source was treating him, and Wilson and Harper

agreed to meet later at one of their stash houses.  (*Id.*).

     According to Moses, a few days later, on January 15, 2015, at approximately 7:50

p.m., Mighty called the target number and spoke to an unknown individual.  (*Id.* at ¶ 28).  During

the call, the following exchange occurred:

| | |
|---|---|
| Unknown Male: | Hello? |
| Mighty: | Yeah, you got talk, yeah you got to talk to the people, man, cause people are running away from me.  They got to stop putting their hands in the cake now.  It's been too many trips now, way to many, they, they, they this damn.  You just do the math on how many trips, an how many, them that is.  You know what I'm saying? |
| Unknown Male: | Yeah, |
| Mighty: | That shit add up, man.  This people calling me an its crazy. |
| Unknown Male: | [unintelligible] [39 seconds] |
| Mighty: | Like I said, I be tryin to give up that number you kind of give to me.  So that way it can go and then I try to take my little thing out of it.  I can't even go in it no more.  Now it's to the point where I got to keep my number.  To, to, try to get something but still it's still short.  Like its just enough |
| Unknown Male: | I'm, I'm pissed. |
| Mighty: | It's just enough, that just comin like, sh… crazy man. |
| Unknown Male: | Looks good, how much you getting now. |
| Mighty: | Nah, that shit is like 55 cent, 56 cent and then you know the math that.  That good for you and them but then the thing |

|                 |                                                                                                                                           |
|-----------------|-------------------------------------------------------------------------------------------------------------------------------------------|
|                 | what I can't because I can't even make nothing because they don't …                                                                       |
| Unknown Male:   | You know, then, then take my profit out of it.  Take another half so alright?                                                             |
| Mighty:         | Because they don't even what a whats you call it, they don't want a pay that number.                                                      |
| Unknown Male:   | Take another half off that's it, cause I can't, I can't make it on time [unintelligible]  These, these people give me a headache, you know what I mean. |
| Mighty:         | That crazy, alright.                                                                                                                       |
| Unknown Male:   | These people, its you people an given me headache.  I want fuckin [unintelligible]…. I try, I try [unintelligible] want to try to get it back. |
| Mighty:         | Alright, I ain't try back let me try back.                                                                                                |
| Unknown Male:   | Huh [unintelligible]                                                                                                                       |
| Mighty:         | Nah, I try back, I try back.                                                                                                               |
| Unknown Male:   | So you can look, look, look I got like three more in back.                                                                                |
| Mighty:         | Yeah, cause you know them people they wanted, they want them other people want those, you know what I am saying.                          |
| Unknown Male:   | Want what?                                                                                                                                 |
| Mighty:         | Those other one that would be one, one time.                                                                                              |
| Unknown Male:   | Yeah I know, hopefully, hopefully, hopefully by, by, the end of the week, I see you, you I should be good, I don't know yet.              |
| Mighty:         | Alright, Alright.                                                                                                                          |
| Unknown Male:   | I be rolling [unintelligible] he said only got three.                                                                                     |
| Mighty:         | I need, I need, I need, I need them two.  I need the two at least, so I can do the same thing.  Give him one and then we do the one.       |
| Unknown Male:   | Alright                                                                                                                                    |
| Mighty:         | Alright                                                                                                                                    |

(*Id.*).

According to Moses, based upon his training, experience, and knowledge of the investigation, he believed that Mighty was calling his cocaine source, the unidentified male, to complain about the quality of cocaine that Mighty had recently purchased.  (*Id.* at ¶ 29).  Mighty complained that he was not able to sell the cocaine because of its poor quality.  (*Id.*).  The source suggested that Mighty lower the price of the cocaine and told him that he would provide better quality cocaine later in the week.  (*Id.*).

9

Approximately two days later, on January 17, 2015, at approximately 4:19 p.m.,

another call between Mighty and his alleged cocaine source was intercepted:

| | |
|---|---|
| Unknown Male: | Hello. |
| Mighty: | Yo. |
| Unknown Male: | Yeah. |
| Mighty: | I'm beside my boy right now – like with the people from the last one to the [unintelligible]. |
| Unknown Male: | Yeah. |
| Mighty: | They are willing … two or three or whatever.  I'm beside them right now.  But you know, like … that's what I said if, like … you know what I'm saying? |
| Unknown Male: | Tell them, yo … I don't want the headache.  I don't what the [unintelligible].  I'm not doing it. |
| Mighty: | No, listen to what I'm saying.  Listen to what I'm saying.  Listen to what I'm saying. |
| Unknown Male: | Mm-hmm. |
| Mighty: | If you even came up in one of the cabs, you feel me? |
| Unknown Male: | Yeah. |
| Mighty: | And you put two in one of the cabs and two in the next one … they'll grab all three one time and you can push back out.  You know what I'm saying?  And I can just have that one. |
| Unknown Male: | Yeah, but number are you talking about? |
| Mighty: | I mean … shit!  I mean … it's going to be a one shot deal.  You know what I'm saying? And you ... |
| Unknown Male: | No, but what number are you talking about? |
| Mighty: | I mean, tell me something so that I can tell them so that way, you know what I'm saying? |
| Unknown Male: | [voices overlap] |
| Mighty: | Now, this is just the point.  You see the last one, too?  Just the last one right here? |
| Unknown Male: | Yeah. |
| Mighty: | That shit is like … even they complain.  They see it like all in there.  Like, hard, dusty.  There's a lot of bullshit in it.  You know what I'm saying?  And they can see it in it?  You know what I'm saying?  Like, they complaining like … that shit … that shit … if they were old boy … |
| Unknown Male: | [unintelligible] |
| Mighty: | Yeah.  That's what took so long because some n***** were hitting me back just now – I'm saying.  And I never got a change to look at it, you know what I'm saying?  Because I didn't want to go through the headache of doing it and then being stuck with something that's already put together and gotta give it to somebody else.  You know |

|                  |                                                                                                                                                                                                                                                                                                                                    |
|------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | what I'm saying?  So that's why when they are doing that, like, they are going too hard.  I understand the shit be nice and pretty and n***** want extra but they are going too hard, now.  Because now, even when old boy opened up the other day … |
| Unknown Male:    | Yeah. |
| Mighty:          | That was like … I didn't even touch it.  I just gave it to him the way you gave it to me.  And that shit not even doing that.  It should have been doing more than that to be closed up.  You know what I'm saying?  I didn't do nothing to it.  But these cats – these cats – |
| Unknown Male:    | I don't know … look, look, look … |
| Mighty:          | This is what I'm going to do!  This is what I'm going to do.  Let me work something out.  Hold on.  Listen to what I'm saying.  Um… |
| Unknown Male:    | I don't know yet because there isn't much left. |
| Mighty:          | Alright.  Listen to what I'm saying.  Listen to what I'm saying.  Is it the same ones though? |
| Unknown Male:    | [unintelligible] the same ones. |
| Mighty:          | Damn. |
| Unknown Male:    | Same ones. |
| Mighty:          | Yeah.  Because … this is what I'm saying. |
| Unknown Male:    | That's all that's left right now. |
| Mighty:          | Listen.  Listen. |
| Unknown Male:    | [voices overlap] |
| Mighty:          | I walked out the room.  That's what I'm saying. |
| Unknown Male:    | Alright. |
| Mighty:          | It's like … them shit – them shit's only doing … you hear me? |
| Unknown Male:    | Huh? |
| Mighty:          | You hear me? |
| Unknown Male:    | Huh? |
| Mighty:          | You hear me?  It's more like … |
| Unknown Male:    | Huh? |
| Mighty:          | They are doing like, 55, 56 cents when you take them out the thing, right?  So, for me to get back to you and I try to take off a little something just so I can eat, that way I can get at the lower number, it ain't worth it because their shit is coming up even more … it's coming back like 52 cents. |
| Unknown Male:    | Uh-huh. |
| Mighty:          | You understand what I'm saying? |
| Unknown Male:    | So the price is not coming back at all? |
| Mighty:          | No, it's coming back like, at 50 and 52.  You know what I'm saying? |
| Unknown Male:    | Yeah. |

| | |
|---|---|
| Mighty: | That's fucking me up because I try to get it for a price so that they won't complaint but the shit is still not there. Because y'all done … they done did something.  You know what I'm saying? |
| Unknown Male: | [voices overlap].  I already seen that.  I already o … I already did 20. |
| Mighty: | Yeah, because it's like … |
| Unknown Male: | I already did one of them and .. [unintelligible] that's all I got. |
| Mighty: | Yeah.  Listen it's 56 dollars.  That doesn't [unintelligible] with the number that you're given me.  And then I'm moving.  It like … it ain't leaving me no room to say well, give me this number and … I ain't go make nothing. That's why if they just … Okay, so, what kind of number will you give me for all three of them?  If he take all three of them.  If he can come and say, it's four of them, you know what I mean?  And give him a number… |
| Unknown Male: | [unintelligible] |
| Mighty: | …take them and that way they won't be even touched.  No nothing. |
| [sneeze] | |
| Unknown Male: | I gotta wait for the next one.  [unintelligible] |
| Mighty: | Okay.  Okay.  We'll do that.  I'll do that.  I'll do that.  Just … okay.  But right now, I need a little push.  I don't know if you can throw the twins in there this trip.  Just for me. |
| Unknown Male: | I don't know.  I'll let you know because I only got … I have like two on hand.  And I need one for me.  I'll give you a holler. |
| Mighty: | Okay. |
| Unknown Male: | Alright? |
| Mighty: | Yeah, you said … just link me later, then.  Link me later when you get everything situated.  I'm a tell him we'll wait until that new thing comes in this week, right? |
| Unknown Male: | Yep.  [unintelligible].  Okay? |
| Mighty: | Okay and I'll tell him I'll wait for the number and we'll put it together when the new one comes in.  But if you can, throw two things in there … the number … they are crying over that one, man!  They are crying!  Because I gotta eat, too, and I gotta … you know what I'm saying?  And that number is crazy! |
| Unknown Male: | Let me talk to the people [unintelligible] other half.  These are … these are different people. |
| Mighty: | Alright, alright.  Just … |
| Unknown Male: | These are different.  I don't have the other ones. |
| Mighty: | Alright, alright.  Okay.  Yeah. |

|              |          |
|--------------|----------|
| Unknown Male: | Alright. |
| Mighty:       | Alright. |

(*Id.* at ¶ 30).

According to Moses, Mighty called his cocaine source and informed him that Mighty was with one of his customers who wanted to purchase a quantity of cocaine from the source similar to the cocaine the source had previously distributed.  (*Id.* at ¶ 31).  The source responded that he did not want the headache of having to deal with another person complaining about the cocaine.  (*Id.*).  Mighty responded that they were processing the current supply of cocaine and the weights were less than expected and some people were asking for their money back.  (*Id.*).  The source told Mighty to wait for the next shipment of cocaine, the quality of which would be better.  (*Id.*).

Approximately two days later, on January 19, 2015, at approximately 8:09 p.m., another call between Mighty and the cocaine source was intercepted:

|               |                                                                                                                                              |
|---------------|----------------------------------------------------------------------------------------------------------------------------------------------|
| Unknown Male: | Yo?                                                                                                                                          |
| Mighty:       | Yo.                                                                                                                                          |
| Unknown Male: | Yeah.                                                                                                                                        |
| Mighty:       | [Inaudible]….you know just bunch of complaints, they getting mad at me.  They said this ain't the same; I'm not the same guy I used to be when we started off. |
| Unknown Male: | Whatcha do, I can't be the fuckin same guy either.                                                                                           |
| Mighty:       | Right, but I'm, I'm almost ready so, I'll be calling you in a few.                                                                           |
| Unknown Male: | Umm.                                                                                                                                         |
| Mighty:       | I'm almost ready, they they just they crying man, they crying.  I'm just out here for free now.                                             |
| Unknown Male: | You know what, I'll cut it off for a couple of days then.                                                                                    |
| Mighty:       | [Inaudible]… person?                                                                                                                         |
| Unknown Male: | [Inaudible]                                                                                                                                  |
| Mighty:       | That shit is, that shit is like, that shit, that shit.                                                                                       |
| Unknown Male: | Which one was crying the one with the whole thing or the other?                                                                              |
| Mighty:       | Both of them, both of them was the same thing, they whoever is fucking with it man they going too hard on it now man, they going hard.  But they, they mix matching |

13

|                |                                                                                                                       |
|----------------|-----------------------------------------------------------------------------------------------------------------------|
|                | and doubling and filling back up, and that shit is not working out.  Like I, I ended up having pay back everybody you know I'm saying.  For me there won't be nothing extra in there. |
| Unknown Male:  | [Inaudible].. to I get my other people back, I can't get that until I pay them off. |
| Mighty:        | Right, and I'm trying, you know, I'm, I'm still dealing my attorney with that so you already know. |
| Unknown Male:  | [Inaudible]                                                                                                            |
| Mighty:        | Alright I will hit you back when I get to the house.                                                                   |
| Unknown Male:  | Alright bye.                                                                                                           |

(*Id.* at ¶ 32).

According to Moses, Mighty continued to complain about the quality of the cocaine and the fact that it was overly processed.  (*Id.* at ¶ 33).  The source asked who was complaining, and Mighty responded that several different people had complained.  (*Id.*).  The source told Mighty that Mighty needed to sell the remaining cocaine so that he could pay for the cocaine that the source had supplied and then contact another supplier for better quality cocaine. (*Id.*).

On January 22, 2015, at approximately 9:44 a.m., a call between Mighty and an unknown individual using cellular telephone number 347-549-0774 was intercepted:

|                |                                                                                                                       |
|----------------|-----------------------------------------------------------------------------------------------------------------------|
| Unknown Male:  | Yo?                                                                                                                   |
| Mighty:        | Yo.  I was about to come grab you quick…Pick up Chin [unintelligible] at the airport. |
| Unknown Male:  | Hmm?                                                                                                                  |
| Mighty:        | Said I was about to come grab you quick so you can pick up Chin with me at the airport. |
| Unknown Male:  | Allright.                                                                                                             |
| Mighty:        | Plane come in at ten-thirty.  It nine-forty-five.  I will be there like ten –fifteen. |
| Unknown Male:  | Allright.                                                                                                             |

(*Id.* at ¶ 34).  According to Moses, during this call, Mighty contacted an unknown male and told him that the cocaine source "Chin" would be arriving in Rochester at 10:30 a.m.  (*Id.* at ¶ 35).

14

Approximately one hour later, at 10:34 a.m., a call between Mighty and the same unknown male was intercepted:

| | |
|---|---|
| Unknown Male: | Yeah. |
| Mighty: | Yeah.  He had already here. |
| Unknown Male: | [Unintelligible]. |
| Mighty: | No he got here at ten past so.  I am up here now so.  I am going to come grab you afterwards |
| Unknown Male: | Alright. |

(*Id.* at ¶ 36).  Moses explained that Mighty called the unidentified male and told him that the source's flight had arrived early and that Mighty was on his way to pick up the source.  (*Id.*).

Moses stated that a surveillance team was present in the area of the Rochester International Airport that day.  (*Id.* at ¶ 37).  There, the team observed a 2015 Cadillac driven by Mighty.  (*Id.*).  According to Moses, a black male with a beard, dreadlocks, and a Kangol hat exited the airport and entered the front passenger seat of the Cadillac.  (*Id.*).  The vehicle was followed to a nearby bank.  (*Id.*).  There, the passenger entered the bank and returned a short while later to the Cadillac.  (*Id.*).  Mighty drove back to the airport, where his passenger exited the vehicle.  (*Id.*).  Mighty's passenger was eventually identified as Bourne.  (*Id.*).

According to the government, at the time of the wiretap order, the agents believed that the person using telephone numbers 347-968-3130 and 347-753-6469 was Bourne.  (Docket # 115 at 24 n.4).  The government later learned, however, that the individual using those telephones was an individual named Winifredo Gonzales, who used the alias "Chin" and resided in Brooklyn, New York.  (*Id.*).

**II.**   **Bailey's Affidavits**

Bailey has submitted several affidavits in an effort to establish standing to challenge the various wiretap warrants.  (Docket ## 119 at 3; 127 at 1; 132).  In affidavits dated February 1, 2016, and March 28, 2016, Bailey stated that he was the registered owner and user of telephone number 347-549-0774 and that his voice and text messages were intercepted over seven telephone numbers, 646-842-5157, 585-802-5351, 585-615-9785, 585-474-2462, 347-993-3581, 347-968-3130, and 347-753-6469, between January 5, 2015, and February 10, 2015.  (Docket ## 119 at 2; Docket # 127 at 2).

The government maintained that such statements were insufficient to establish standing because Bailey had failed to identify, for each challenged phone line, a particular communication in which he participated that was intercepted.  (Docket # 126 at 2).  The government reiterated this position during oral argument before the Court on April 8, 2016.  (Docket # 146).  At that time, Bailey indicated that he would submit a supplemental affidavit identifying at least one intercepted communication in which he participated for each of the targeted lines.

Bailey thereafter submitted the supplemental affidavit dated April 14, 2016.  (Docket # 132).  In that affidavit, Bailey again affirmed that he was the owner and user of the cellular telephone number 347-549-0774.  (*Id.*).  In this affidavit, he asserted that his voice and text messages were intercepted over only five telephone numbers: 646-842-5157, 585-615-9785, 585-474-2462, 347-993-3581, and 347-968-3130.  (Docket # 132).  For each of the five target numbers identified, Bailey identified one intercepted call by reference number and date in which he participated.  (*Id.*).

## REPORT & RECOMMENDATION

### I.     Motion to Suppress Wiretap Evidence

Bailey challenges the validity of all three of the wiretap orders on the grounds that (1) the supporting affidavits offered by Bernabei and Moses failed to demonstrate that traditional investigative procedures had been attempted and had proved unsuccessful (Docket ## 111 at 55-62; 119 at 19-20); (2) that Bernabei and Moses attributed narcotics-related meanings to innocent telephone conversations (Docket # 111 at 37); and, (3) that the wiretaps failed to identify Bailey as a known target (Docket ## 111 at 28-29, 35-37; 119 at 15-17).  Bailey also asserts specific challenges to each of the three individual warrants.  (Docket ## 111 at 45-48, 48-49, 49-55; 119 at 17-24).

### A.     Standing

Under 18 U.S.C. § 2518(10), an "aggrieved person" may "move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."  18 U.S.C. § 2518(10)(a).  18 U.S.C. § 2510(11) defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11); *see United States v. Fury*, 554 F.2d 522, 525 (2d Cir.) (a person "who has had his conversations intercepted during the wiretap" is an aggrieved person), *cert. denied*, 433 U.S. 910 (1977).

As discussed above, Bailey has submitted an affidavit stating that he was intercepted over the three wiretap orders for target numbers 585-615-9785, 646-842-5157, and

347-968-3130.  (Docket # 132).  The affidavit adequately demonstrates, and the government

does not dispute, that Bailey has standing to move to suppress communications intercepted over

these target numbers.

> **B.**  **Other Investigative Procedures**

Bailey seeks suppression of the intercepted communications on the grounds that

the supporting affidavits of Bernabei and Moses failed to demonstrate that traditional

investigative procedures had been attempted and had proved unsuccessful.  (Docket ## 111 at

55-62; 119 at 19-20).  In other words, according to Bailey, the affidavits failed to justify the

"need" for wiretap interception.  (*Id.*).

An application for wiretap authorization must contain "a full and complete

statement as to whether or not other investigative procedures have been tried and failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C.

§ 2518(1)(c).  A judge may approve a wiretap application only after determining that such a

showing has been made.  18 U.S.C. § 2518(3)(c).  This requirement "is simply designed to

assure that wiretapping is not resorted to in situations where traditional investigative techniques

would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  In

other words, the government need not "exhaust all conceivable investigative techniques before

resorting to electronic surveillance," but must resort to telephonic surveillance only "when it is

necessary to assist in law enforcement."  *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir.

2009); *United States v. Funderburk*, 492 F. Supp. 2d 223, 242 (W.D.N.Y. 2007) (the "other

investigative procedures" requirement is not intended to turn electronic surveillance into a "tool

of last resort").  "'Merely because a normal investigative technique is theoretically possible, it

does not follow that is likely' to succeed."  *United States v. Crosby*, 2010 WL 4703615, *3

(W.D.N.Y.) (quoting *United States v. Torres*, 901 F.2d 205, 231-32 (2d Cir. 1990)), *report and recommendation adopted*, 2010 WL 4703596 (W.D.N.Y. 2010).  The wiretap application needs only to inform the issuing court "of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."  *United States v. Concepcion*, 579 F.3d at 218 (quoting *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir.), *cert. denied*, 528 U.S. 875 (1999)).

In narcotics conspiracy investigations, this requirement may be satisfied by "describing how traditional investigative techniques had failed to provide more than a 'limited picture' of [the] narcotics organization."  *United States v. Valdez*, 1991 WL 41590, *2 (S.D.N.Y.) (quoting *United States v. Torres*, 901 F.2d at 232), *aff'd*, 952 F.2d 394 (2d Cir. 1991).  Moreover, wiretaps are particularly appropriate when "the telephone is routinely relied on to conduct the criminal enterprise under investigation."  *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation omitted).

This Court's review of the issuing court's determination is not *de novo*; rather, the reviewing court must determine only whether "the facts set forth in the application were minimally adequate to support the determination that was made." *Concepcion*, 579 F.3d at 218 (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (agent's assertion that surveillance had been conducted unsuccessfully on numerous occasions was "minimally adequate"), *cert. denied*, 524 U.S. 905 (1998)); *see also United States v. Miranda*, 1993 WL 410507, *2 (S.D.N.Y. 1993) (issuing court's determination concerning sufficiency of normal investigative techniques is entitled to "substantial deference").  The reviewing court must test the application in a "practical and commonsense fashion."  *Concepcion*, 579 F.3d at 218.

Applying a practical, commonsense, and deferential review to the instant case, I find that Bernabei's and Moses's affidavits were at least minimally adequate to support a finding that further use of traditional investigative techniques appeared unlikely to succeed.  In their affidavits, the investigators identified the purposes of the investigation as broader than simply arresting and prosecuting the known targets, but also as gathering sufficient evidence to disable the vertical distribution network in which the targets participated and identifying other members of the drug distribution conspiracy, including suppliers and distributors, facilities used by the conspirators, and physical evidence of the drug operation.  (Docket ## 115-3 at ¶¶ 33-34; 115-6 at ¶¶ 39-40; 115-9 at ¶¶ 40-41).

Bailey challenges the necessity of the wiretaps, contending that traditional investigative means were not employed prior to seeking the warrants and would have succeeded in achieving the objectives of the investigation.  (Docket # 111 at 55-61).  According to Bailey, traditional investigative techniques, including the use of confidential informants, controlled buys, surveillance, including pole cameras, and GPS tracking devices, had successfully uncovered the identities of "the upper echelons" of the conspiracy and the locations used by those individuals. (*Id.* at 56-57).  He further contends that the fact that a conversation intercepted on January 5, 2015, was used to support an application for a warrant dated the same day suggests that other investigative techniques relating to that particular phone had not been undertaken before seeking wiretap authorization.  (Docket # 119 at 18).  Bailey also maintains that the affidavits' inclusion of boilerplate language relating to an "unknown male" suggests that the allegations about the man were false.  (*Id.* at 20-21).

Although Bernabei and Moses affirmed that customary investigative techniques, including interviews with a confidential informant and surveillance, had assisted in identifying

some targets and some stash houses, these techniques had not accomplished and were not likely to accomplish the objectives of the investigation or were otherwise too dangerous to employ. (Docket ## 115-3 at ¶¶ 35-48; 115-6 at ¶¶ 40-51; 115-9 at ¶¶ 42-53).  For example, although surveillance techniques had been utilized, Bernabei and Moses reported that one of the surveillance subjects employed driving tactics designed to avoid surveillance, which made traditional surveillance techniques difficult to employ.  (*Id.*).  Further, the investigators stated that target locations were located in residential neighborhoods, thus limiting their ability to conduct surveillance without detection.  (*Id.*).

According to the investigators, the prospect of success with undercover officers was limited because the confidential informant was not in a position to make an introduction to Mighty or Mighty's source.  They also affirmed that no law enforcement agency in Monroe County knew of any confidential informant who could assist with proactive cooperation in the investigation.  (*Id.*).  The investigators further explained that search warrants were not likely to accomplish the investigative goals because they would not identify roles of unknown coconspirators or produce evidence sufficient to reveal the full picture of the vertical structure of the network.  (*Id.*).  According to the investigators, a grand jury investigation was impractical because it would likely tip off the conspirators.  (*Id.*).

On this record, the Court is satisfied that the investigators adequately explained why traditional investigative methods risked jeopardizing the investigation and were unlikely to succeed.  For these reasons, and applying the legal standards described above, I reject Bailey's arguments that the wiretap orders are invalid because law enforcement did not exhaust other traditional investigative techniques.  *See Concepcion*, 579 F.3d at 218, 219 (law enforcement need not exhaust "all conceivable investigative techniques"; fact that "leads could have been

better leveraged before resorting to a wiretap" does not mandate suppression where affidavit was

otherwise "minimally adequate"); *United States v. Mitchell*, 2010 WL 55927, \*5 (W.D.N.Y.

2010) (affidavits were sufficient where they asserted that informants and surveillance provided

only "a limited picture of the drug distribution network").  In the affidavits, the investigators

sufficiently identified the traditional investigative techniques that had been utilized and

adequately informed the issuing court why other techniques were unlikely to achieve the aims of

the investigation.  Accordingly, I recommend that Bailey's motions to suppress the wiretap

communications based upon the alleged failure to demonstrate the futility of other investigative

techniques be denied.

      **C.**    **<u>Failure to Identify Known Targets</u>**

      Bailey argues that the wiretap orders are invalid because they do not identify him

or an individual using the nickname "Stamma" as targets of the interception.  (Docket ## 111 at

28-29, 35-37; 119 at 15-17).  While conceding that the government need not establish probable

cause with respect to each anticipated interceptee (Docket # 119 at 15-17), Bailey nevertheless

maintains that suppression is warranted because he is not identified as a target in any of the

warrant applications (Docket # 111 at 36).  According to Bailey, because his identity was known

to the government as of January 5, 2015, warrants issued on or after that date should have

included him as an identified target.  (*Id.*).

      The government maintains that even assuming that Bailey or Stamma were

known to the investigating agents, the failure to identify them as targeted interceptees does not

warrant suppression.  (Docket # 115 at 17-18).  The government also explains that it had

originally believed mistakenly that "Stamma" was Mighty, but later learned that "Stamma" was

an unidentified individual who used the phone number 646-842-5157.  (*Id.* at 18).  After learning

that fact, in applying for an extension order for that number, the investigators listed the target

interceptees as "Mighty" and "an unknown male known as 'Stamma.'" (*Id.*).

Pursuant to 18 U.S.C. § 2518(1)(b)(iv), every application for an "order

authorizing or approving the interception of wire, oral or electronic communication under this

chapter" should include "the identity of the person, if known, committing the offense and whose

communications are to be intercepted." *See* 18 U.S.C. § 2518(1)(b)(iv). Accordingly, an

individual should be identified in an application for a wiretap when the government "has

probable cause to believe that the individual is engaged in the criminal activity under

investigation and expects to intercept the individual's conversations over the target telephone."

*United States v. Donovan*, 429 U.S. 413, 428 (1977).

Failure to comply with this requirement does not, however, invalidate a warrant

that otherwise satisfies the requirements of Title III or demand suppression of communications

intercepted pursuant to that warrant. *See id.* ("the failure to identify additional persons who are

likely to be overheard engaging in incriminating conversations could hardly invalidate an

otherwise lawful judicial authorization"); *United States v. Miller*, 116 F.3d at 664. "Thus, for

suppression even to be considered, the defendant[] must show not only a violation of the

identification requirement, but also (1) that the failure to identify [the defendant] was motivated

by some improper purpose – presumably a fear that Title III monitoring would not be authorized

– and (2) that the court would have concluded probable cause was lacking had it been furnished

the information." *United States v. Milan-Colon*, 1992 WL 236218, *17 (S.D.N.Y. 1992).

Even assuming the government had information sufficient to identify Bailey and

Stamma in the warrant applications, but failed to do so, suppression is not warranted because

Bailey has not shown that the government acted with an improper purpose. *See id.* Indeed, the

absence of any improper motive "is particularly apparent where, as here, the Title III order

explicitly authorized the interception of conversations between the named subjects and 'others as

yet unknown.'" *See id.*; (*see*, *e.g.*, Docket # 115-1 at 3).

        Bailey has alleged in conclusory fashion that the investigators knew his identity

by January 5, 2015, and their failure to identify him by name thereafter must have been

purposeful. (Docket # 119 at 17). He has presented no information, however, to suggest that the

government's failure to identify him as a potential interceptee was motivated by an improper

purpose. On this record, I conclude that suppression is not warranted. *See United States v.*

*Donovan*, 429 U.S. at 439-40 (suppression of intercepted communications not warranted;

"[a]lthough the [g]overnment was required to identify [the respondents] in the . . . application for

an extension of the initial intercept, failure to do so in the circumstances here presented did not

warrant suppression under [§] 2518(10)(a)(i)"); *Miller*, 116 F.3d at 664 ("the district court

properly rejected defendants' contention that they were entitled to suppression because the

[s]tate, knowing that [defendant] was engaged in criminal activity with [the other defendant] and

that [the defendant's] conversations would likely be intercepted, omitted [the defendant's] name

from the application for the [other defendant's] wiretap"); *United States v. Fernandez*, 2013 WL

503966, *8 (S.D.N.Y. 2013) ("[i]t is well established, however, that Title III does not require the

[g]overnment to identify all target subjects in a wiretap application"); *United States v. Hill*, 2012

WL 1014757, *5 (W.D.N.Y. 2012) ("[t]his [c]ourt notes that a violation of the identification

requirement does not generally require the suppression of a wiretap"); *United States v.*

*Milan-Colon*, 1992 WL 236218 at *17 (suppression not warranted where defendants failed to

demonstrate that government omitted their identities from warrant application due to an improper

purpose); *United States v. Roberts*, 1991 WL 221099, *6 (S.D.N.Y. 1991) ("[d]efendants have

each utterly failed to show . . . that government agents knowingly failed to identify them for the

purpose of keeping relevant information from the district court such that the court might have

concluded that probable cause was lacking"), *aff'd*, 9 F.3d 1537 (2d Cir. 1993), *cert. denied*, 511

U.S. 1019 (1994); *United States v. Juliao*, 1990 WL 250178, *2 (S.D.N.Y. 1990) ("suppression

is not an appropriate remedy for such a defect because the failure to identify a known target of a

wiretap in a renewal application does not implicate the core purposes of the statute in 'guarding

against unwarranted use of wiretapping of electronic surveillance'") (quoting *Donovan*, 429 U.S.

at 437).  Further, Bailey's reliance on *United States v. Bernstein*, 509 F.2d 996 (4th Cir. 1975)

(Docket # 111 at 29) is misplaced; *Bernstein* was vacated and remanded in light of the Supreme

Court's decision in *United States v. Donovan*, 429 U.S. 413 (1977).  *See United States v.*

*Bernstein*, 430 U.S. 902 (1977).

> ### D.    <u>Probable Cause</u>

I turn next to Bailey's challenge that the warrants were not supported by probable

cause to believe that the communications to be intercepted would reveal evidence of criminal

offenses.  (Docket ## 111 at 37, 53-54; 119 at 21-22).  He appears to challenge the validity of all

of the warrants on the grounds that he disagrees with the investigators' interpretations of the

intercepted communications.  (Docket # 111 at 37).  He also challenges the January 26, 2015,

wiretap for target number 347-968-3130 on the grounds that it is unsupported by probable cause.

(*Id.* at 40, 53-54).

Pursuant to 18 U.S.C. § 2518(3), before issuing a wiretap order, a judge must

determine:

> [1] that there is probable cause to believe that a crime has been, is
> being, or is about to be committed; [2] probable cause to believe
> that communications about the crime will be obtained through the
> wiretap; [3] that alternative means have been tried and failed or

> appear too dangerous or unlikely to succeed; and [4] probable
> cause that the premises to be wiretapped are being used for
> criminal purposes or are used or owned by the target of the
> wiretap.

*United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993).

The probable cause standard applicable to wiretaps is the same as that required for

a traditional search warrant. *Id.* (citing *United States v. Rowell*, 903 F.2d 899, 901-02 (2d Cir.

1990); *United States v. Fury*, 554 F.2d at 530). In other words, probable cause must be

determined by evaluating the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238

(1983). As a reviewing court, this court must accord "substantial deference" to the issuing

court's finding of probable cause. *United States v. Wagner*, 989 F.2d at 72.

Bailey maintains that the warrants were not supported by probable cause because

many of the communications on which they rely are ambiguous and could have innocent

meanings. (Docket # 111 at 37). Of course, as the Second Circuit has recognized, "drug dealers

rarely speak openly about their trade," and the use of "narcotics code" may support a probable

cause finding. *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995); *see also United*

*States v. Velasquez*, 271 F.3d 364, 372 (2d Cir. 2001) ("we have observed that individuals

dealing in cocaine utilize a variety of terms to refer to the illegal substance") (collecting cases),

*cert. denied*, 535 U.S. 965 (2002); *United States v. Davis*, 2013 WL 322122, *5 (M.D. Ala.) ("an

issuing judge 'may consider an agent's training and experience to offer opinions as to methods

utilized by drug traffickers and, based on the same, consider an agent's interpretation of code

words and language in determining whether . . . probable cause exists'") (quoting *United States*

*v. Flores*, 2007 WL 2904109 (N.D. Ga. 2007)), *report and recommendation adopted*, 2013 WL

10722803 (M.D. Ala. 2013), *aff'd*, 611 F. App'x 961 (11th Cir.), *cert. denied*, 136 S. Ct. 425

(2015).

Here, the supporting affidavits for the January 5, 14, and 26, 2015, warrants established ample probable cause to believe that narcotics trafficking crimes were being committed and that communications over the targeted phones would reveal evidence about the commission of those crimes.  As an initial matter, the affidavits incorporated and relied upon the facts asserted in approximately twenty previous wiretap authorization and extension applications.  (Docket ## 115-3 at ¶¶ 5-20; 115-6 at ¶¶ 5-24; 115-9 at ¶¶ 5-25).  Each of the affidavits provided excerpts of and summarized numerous conversations between Mighty and his cohorts, intercepted pursuant to earlier eavesdropping warrants, in which they discussed cocaine trafficking.  (*See* Docket ## 115-3 at ¶¶ 23-32; 115-6 at ¶¶ 27-37; 115-9 at ¶¶ 28-39).  Although the participants in the communications did not use overt language about drug dealing, Moses and Bernabei affirmed, based upon their law enforcement experience, that the conversations actually concerned drug activities.  (*Id.*).  The affidavits further summarized evidence corroborating the agents' interpretations, such as surveillance confirming meetings discussed in the calls, including meetings between Mighty's associates and their alleged cocaine customers.  (Docket # 115-3 at ¶¶ 29-30).  I find that the affidavits sufficiently demonstrated probable cause to believe that Mighty and his associates were using and would continue to use the target telephones during the period of interception to discuss and facilitate his drug trafficking activities.  (*See* Docket ## 115-3 at ¶¶ 23-32; 115-6 at ¶¶ 27-37; 115-9 at ¶¶ 28-39).  *See Fury*, 554 F.2d at 530-31 (probable cause shown where ambiguous statements could be "reasonably interpreted to indicate what the detective interpreted them to be" when considered in context of defendant's criminal record and ongoing investigation); *United States v. Osiomwan*, 2013 WL 2458459, *6 (D. Md. 2013) ("[t]he coded language in the wiretapped calls indicated that [defendant] was conspiring with [another individual] to distribute heroin[;] . . . [t]hese facts are sufficient for a reasonable

person to believe the offense had been committed"), *aff'd*, 593 F. App'x 194 (4th Cir. 2014);

*United States v. Kazarian*, 2012 WL 1810214, *8 (S.D.N.Y. 2012) ("[w]hile [defendant] argues

that the words 'check,' 'bank,' or 'dollars,' were never used, a finding of probable cause is not

precluded merely because 'many of the conversations were in vague and coded language'")

(quoting *United States v. Bellomo*, 954 F. Supp. 630, 638 n.3 (S.D.N.Y. 1997)); *United States v.*

*Felix*, 2011 WL 7404389, *11 (W.D.N.Y. 2011) (officer's interpretation that conversations

involving defendant "related to the care and maintenance of a marijuana grow operation"

supported probable cause finding), *report and recommendation adopted*, 2012 WL 566886

(W.D.N.Y. 2012); *United States v. Lighten*, 2010 WL 3853307, *3 (W.D.N.Y.) ("[t]he evidence

shows that probable cause arose not merely because of the coded telephone call, but also

subsequent surveillance of [defendant] and further phone calls confirming a meeting by the

confidential informant and [defendant] for the informant to purchase drugs from [defendant]"),

*report and recommendation adopted*, 2010 WL 3834572 (W.D.N.Y. 2010).

      Bailey also maintains that the January 26, 2015, warrant lacked probable cause to

believe that Bourne was involved in drug trafficking activities or that he was a "cocaine

supplier."  (Docket ## 111 at 50-51; 119 at 21-22).  According to Bailey, the January 26, 2015,

warrant incorrectly identified the user of the mobile telephone number as Garfield Bourne, when

in fact the user was Winifredo Gonzales, a Brooklyn resident who used the alias "Chin."

(Docket ## 111 at 50-51, 53-54; 115 at 24 n.4).

      When the affidavit was signed, the investigators believed, after conducting

surveillance of Mighty and a man they had identified as Bourne together at the airport and at a

bank in Rochester, that Bourne was the person who used that number for which the January 26,

2015, warrant was issued.  This conclusion was reasonable based upon intercepted phone calls

between Mighty and an individual using the target number, who used the name "Chin."  When

the phone calls between Mighty and Bailey discussing retrieving "Chin" from the airport were

intercepted, Moses reasonably believed that the individual to be retrieved from the airport was

"Chin," the individual using the target line.  As discussed below in connection with Bailey's

*Franks* challenge, that the investigators' conclusions proved incorrect does not undermine the

adequacy of the probable cause showing at the time the warrant issued.

 E.     **Miscellaneous Challenges**

 Bailey challenges the validity of the January 5, 2015, warrant on the grounds that

it identified Mighty as someone who was also known as "Dred," despite the fact that the

supporting affidavit included no facts supporting the conclusion that Mighty used the alias

"Dred."[4]  (Docket ## 111 at 39; 119 at 18).  Bailey also challenges the validity of the January 14,

2015, warrant on the grounds that the issuing judge's name was not printed in typeface on the

warrant.  (Docket ## 111 at 48-49; 119 at 18-19).  Neither of these challenges presents a legal

basis to invalidate the warrant, and Bailey has cited no caselaw suggesting to the contrary.

(Docket # 115 at 18, 21-22).

 Bailey also challenges the warrants on the grounds that they contained

typographical errors (Docket ## 111 at 40, 52; 119 at 23-24), appeared to include material that

had been included in previous warrants (Docket # 111 at 51-52), or appeared to have been

altered after they were submitted (*Id.* at 54).  None of these challenges identifies any material

defects in the warrant that would render them invalid, nor do they suggest that the issuing judge

abandoned his role or lacked neutrality.  With respect to Bailey's assertion that the January 26,

---

 [4]  Bailey also challenges the validity of this January 5, 2015, warrant on the grounds that it is supported by
an affidavit dated February 3, 2015.  (Docket # 119 at 18).  Contrary to Bailey's assertion, the application and
affidavit in support of the warrant were both executed on January 5, 2015, although the notary who witnessed the
signatures indicated that her commission expired on February 9, 2015.  (Docket ## 115-2 at 8; 115-3 at 19).

2015, affidavit was altered after its submission to Judge Dinolfo, Bailey has not provided any evidence to the Court to support his assertion. Thus, the Court has no basis to conclude that any alterations were made.

Finally, Bailey challenges the January 26, 2015, warrant on the grounds that it improperly authorized interceptions outside the jurisdiction of the issuing judge. (*Id.* at 54-55). According to Bailey, the phone was located and used in Brooklyn, New York, and the interceptions therefore occurred outside the Western District of New York. (*Id.*). However, as the government correctly notes, telephone communications are deemed to be intercepted where the tapped telephone is located *or* where the communications are overheard. (Docket # 115 at 28) (citing *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir.) ("a communication is intercepted not only where the tapped phone is located, but also where the contents of the redirected communication are first to be heard"), *cert. denied*, 506 U.S. 847 (1992) and *United States v. Burford*, 755 F. Supp. 607, 610-11 (S.D.N.Y. 1991) (New York district court judge authorized to order interception of Maryland telephone where conversations routed to DEA wire room in New York; for jurisdiction purposes, an "aural" acquisition is the place "where the communication is actually heard")).

## II.   **Motion for a *Franks* Hearing**

Bailey contends that he is entitled to a *Franks* hearing because of the inclusion of an allegedly false or misleading statement in Moses's affidavit submitted in support of the application for the January 26, 2015, wiretap.[5] (Docket # 111-1 at 14). He further maintains that this false and misleading statement was material to the issuing judge's probable cause

---

[5] Bailey claims entitlement to a *Franks* hearing based upon other allegedly false or misleading statements or omissions contained in other non-wiretap warrants. Those challenges will be addressed in a separate decision.

determination and, when excised from the affidavit, renders the wiretap invalid, thus requiring suppression of the communications seized pursuant to the wiretap.  (*Id.*).

Ordinarily, a reviewing court's obligation is merely to determine that the issuing judge had a "substantial basis for ... conclud[ing] that probable cause existed."  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate"). "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause."  *United States v. Rajaratnam*, 2010 WL 4867402, *7 (S.D.N.Y. 2010) (citing *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000)), *aff'd*, 719 F.3d 139 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2820 (2014).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading" misrepresentations and omissions.  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154).  To justify a *Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding."  *Id.* (citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted).  A hearing is required if the defendant provides the court with a sufficient basis upon which to doubt the truth of the affidavit at issue.  As the Supreme Court has explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those

> allegations must be accompanied by an offer of proof.  They
> should point out specifically the portion of the warrant affidavit
> that is claimed to be false; and they should be accompanied by a
> statement of supporting reasons.  Affidavits or sworn or otherwise
> reliable statements of witnesses should be furnished, or their
> absence satisfactorily explained.

*Franks*, 438 U.S. at 171.

With respect to the first prong, "[a]llegations of negligence or innocent mistake are insufficient."  *Id.*  Instead, "[t]he focus is not on whether a mistake was made, but rather on the intention behind the mistake."  *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001) (citing *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 116 (10th Cir. 1994)), *aff'd*, 69 F. App'x 492 (2d Cir. 2003).  Thus, *Franks* teaches that not all statements in an affidavit have to be true; instead, "the statements [must] be 'believed or appropriately accepted by the affiant as true.'"  *See United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) (quoting *Franks*, 438 U.S. at 165), *cert. denied*, 498 U.S. 866 (1990).

To determine whether a misstatement in an affidavit is material, the court must "set[ ] aside the falsehoods in the application, . . . and determine [w]hether the untainted portions [of the application] suffice to support a probable cause . . . finding."  *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotations and citations omitted), *cert. denied*, 134 S. Ct. 2820 (2014).  According to the Second Circuit, "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause."  *Id.* at 146 (quoting *United States v. Canfield*, 212 F.3d at 718).

In this case, Bailey maintains that Moses's interpretation of his January 22, 2015, conversation with Mighty was false.  (Docket # 111-1 at 14).  According to Bailey, Moses interpreted the conversation to concern arrangements to pick up the cocaine source, who used the

alias "Chin" and who was traveling from New York City to Rochester, New York on a flight scheduled to land at the Rochester airport. (*Id.*). According to Bailey, the investigators subsequently identified the individual whom Mighty met at the airport that day as Garfield Bourne. (*Id.*). Bailey argues that Moses falsely stated that Bourne was Mighty's cocaine supplier. (*Id.*).

The government maintains that when the affidavit in support of the January 26, 2015, warrant for target line 347-968-3130 was submitted, Moses believed that the unknown male using the target line used the alias "Chin." (Docket # 115 at 23-24). At that time, based upon the January 15, 2015, conversation between Mighty and Chin, Moses believed that Chin had indicated he would be providing a better quality supply of cocaine to Mighty. (Docket # 115-9 at ¶ 29). According to the government, when the phone calls between Mighty and Bailey discussing retrieving "Chin" from the airport were intercepted a few days later, on January 22, 2015, Moses reasonably believed that the individual to be retrieved from the airport was the cocaine source. (Docket # 115-9 at 23-24). That individual was identified as Bourne, but the government later learned that the cocaine source who used the target line 347-968-3130 was actually Winifredo Gonzales, a Brooklyn resident who used the alias "Chin." (Docket # 115-9 at 24 n.4).

Although Bailey has established that Moses mistakenly identified Bourne as Mighty's cocaine source, Bailey has failed to demonstrate his entitlement to a Franks hearing. As stated above, "[a] *Franks* hearing is not required where it is sought merely on the basis of an allegation that the information in the . . . warrant affidavit subsequently proved to be inaccurate." *United States v. Harper*, 2006 WL 2873662, *8 (W.D.N.Y. 2006). Rather, the defendant must demonstrate that the affiant knew that the statement was false and intentionally included it

anyway or acted with reckless disregard for the truth when he included the statement in the affidavit.  *See id.*  "Although the Second Circuit has not defined precisely the level of proof necessary to establish reckless disregard for the truth, . . . other courts have articulated the appropriate test as 'whether, viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his (or her) statements or had obvious reasons to doubt the accuracy of the information he (or she) reported.'"  *Id.* (quoting *United States v. Schmitz*, 181 F.3d 981, 986-87 (8th Cir. 1999)).

   Bailey has not offered any evidence to suggest that Moses was aware at the time he submitted his affidavit that Bourne was in fact not the cocaine source.  Nor has Bailey demonstrated that Moses had any basis to doubt the accuracy of his statement that Bourne was the cocaine source.  Although the information ultimately proved to be inaccurate, there has been no showing that Moses either knew or had a basis to doubt that Bourne was the cocaine source at the time he drafted the affidavit.  Accordingly, Bailey has failed to make the required preliminary showing for a *Franks* hearing.  *See United States v. Swartz*, 2008 WL 2357408, *7-8 (W.D.N.Y. 2008) (denying *Franks* hearing despite misstatement in affidavit where court concluded that the officer's affidavit "was not knowingly misleading"); *United States v. Harper*, 2006 WL 2873662 at *9 (denying *Franks* hearing where defendant failed to submit "any evidence to suggest that [the officer] was aware of any alleged falsity at the time she drafted the affidavit or that she disregarded obvious reasons to doubt the accuracy of the information provided by the informant").

   Even if Bailey had presented information to suggest that Moses knew or should have known that Bourne was not the cocaine source, Bailey cannot satisfy the second required showing under *Franks* – that the false information was material to the probable cause finding.  In

other words, even if the information relating to the phone calls between Mighty and Bailey and

the subsequent surveillance observations at the Rochester airport are excised from Moses's

affidavit, sufficient probable cause remained to issue the wiretap.  *See Rajaratnam*, 2010 WL

4867402 at *11 ("a *Franks* hearing is required only if the government's misstatements were

necessary to [the issuing judge's] decision to authorize the [warrant] [;] . . . [the inquiry] is, after

setting aside the government's misstatements and adding what it omitted from the affidavit, does

the Court find that the affidavit set forth minimally adequate facts to establish probable cause").

       In his affidavit, Moses included transcriptions of phone calls between Mighty and

an unknown male using the target number 347-968-3130, and summaries of the meaning of

them, which were based upon his training, experience, and knowledge of the investigation.  Even

without Moses's interpretations, it is clear that during several of the calls Mighty was

complaining about the quality of something he had obtained from the unknown male.  Mighty

complained that although he was paying for "55, 56 cents," he was only able to obtain "like at 50

and 52."  (Docket # 115-9 at ¶¶ 28, 30).  According to Mighty, the discrepancy made it

impossible for him to "take off a little something just so [he could] eat."  (*Id.*).  In response to

Mighty's complaints, the unknown male told Mighty to "take my profit out of it" and that

Mighty should "[t]ake another half."  (*Id.*).  Mighty and the unknown male also discussed

Mighty obtaining further quantities, using terms "one," "two," and "three."  (*Id.*).  Moses

reasonably interpreted these conversations to involve discussions concerning the quantity,

quality, and price of illegal narcotic substances.  (*Id.* at ¶¶ 29, 31).

       Moses's interpretation of these phone conversations is corroborated by the

intercepted phone call between Harper and Wilson, a transcription of which was also included in

Moses's affidavit.  According to Moses, this call revealed that Harper and Wilson were unhappy

with the quality of the cocaine supplied by Mighty.  (*Id.* at ¶¶ 38-39).  During several phone calls

occurring over the course of the next several days, Mighty discussed with the unknown male the

fact that his customers were dissatisfied with the cocaine supplied.  (*Id.* at ¶¶ 28-33).  On this

record, I find that Judge Dinolfo reasonably concluded, based upon the totality of the evidence in

the affidavits, that probable cause existed to believe that additional narcotics-related

conversations would be intercepted over the target line.  *United States v. Felix*, 2011 WL

7404389 at *11 (content of phone conversations interpreted by investigator based upon his

training and experience supported probable cause for warrant when considered in conjunction

with the information learned during investigation connecting individual to narcotics trafficking).

In addition, Judge Dinolfo's probable cause determination was also based upon his familiarity

with the investigation and his knowledge of the content of the approximately twenty wiretap

applications and extension requests, the majority of which he had approved, that were

specifically incorporated by reference into Moses's affidavit.  (*Id.* at ¶¶ 5-25).

> For instance, Moses's affidavit expressly incorporated the January 5, 2015,

affidavit submitted by Bernabei in support of the wiretap application for target number

646-842-5157, believed to be used by Mighty in connection with his narcotics trafficking

activities.  (Docket ## 115-9 at ¶ 23; 115-3).  As explained above, that affidavit recounted the

history of the investigation and the basis for Bernabei's belief that Mighty was engaged in

narcotics trafficking, including his belief that Mighty supplied cocaine to Harper and Wilson.

(Docket # 115-3 at ¶ 21).  Bernabei's affidavit provided excerpts of transcriptions and summaries

of communications between Harper and the target line.  (*Id.* at ¶¶ 23-26).  Bernabei's

interpretations of the calls were corroborated by surveillance observations confirming a meeting

between individuals driving vehicles associated with Wilson and Harper, and Brown, one of

Mighty's associates.  (*Id.* at ¶¶ 29-30).

        In sum, even if the allegations relating to the meeting between Bourne and Mighty

at the Rochester airport are entirely disregarded, the remaining assertions established probable

cause to believe that additional incriminating calls were likely to be intercepted over the target

line.  Accordingly, I conclude that any mistake concerning whether Mighty's cocaine source was

Bourne was not material to the finding of probable cause for the wiretap.  *See Rajaratnam*, 719

F.3d at 156-57 & n.20 ("even assuming, *arguendo*, that these alleged misstatements and

omissions regarding [the confidential informant] . . . were indeed made with 'reckless disregard

for the truth,' we agree with the District Court that they were not 'material'" where the other

allegations were sufficient to support finding of probable cause); *United States v. Wapnick*, 60

F.3d 948, 956 (2d Cir. 1995) (*Franks* hearing not required where "alleged false statement

constituted only one paragraph of an eleven-page affidavit; even if that paragraph were redacted,

the remainder of the affidavit provided ample probable cause for the search warrant"), *cert.

denied*, 517 U.S. 1187 (1996); *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir.) ("the

ultimate inquiry on a motion to suppress is not – as defendants contend – whether the affidavit

contains false allegations or material omissions, but whether after putting [the challenged

statements] aside, there remains a residue of independent and lawful information sufficient to

support probable cause"), *cert. denied*, 474 U.S. 1032 (1985); *United States v. Battle*, 2013 WL

5769982, *11 (D. Vt. 2013) ("even without the material misstatements of fact, the search warrant

was supported by probable cause").  For these reasons, I recommend denial of Bailey's motion to

suppress on the grounds that Moses knowingly included false material information in his

affidavit.

III.    *Leon*'s Good Faith Exception

Finally, Bailey argues that the *Leon* good faith exception to the exclusionary rule is inapplicable to state issued wiretap warrants.  (Docket # 111 at 30-34).  Bailey also maintains that even if *Leon* were applicable, suppression is nevertheless warranted because the warrants were facially insufficient and the issuing judge was misled.  (Docket # 111 at 37-45).

Although the Second Circuit has not yet determined whether *Leon's* good faith exception extends to wiretaps, "the Second Circuit has held that statutory exclusionary provisions governing wiretap evidence do not preclude the application of other recognized exceptions to the Fourth Amendment Exclusionary rule," *see United States v. Skelos*, 2015 WL 6159326, *8 n.2 (S.D.N.Y. 2015) (citing *United States v. Bianco*, 998 F.2d 1112, 1126 (2d Cir. 1993), *cert. denied*, 511 U.S. 1069 (1994), *abrogated on other grounds by Groh v. Ramirez*, 540 U.S. 551 (2004)), and courts within this Circuit have applied *Leon's* good faith exception to wiretaps, *see id.* ("[c]ourts in numerous other circuits have [applied *Leon* to wiretap evidence;] . . . [t]he Second Circuit has not ruled on this issue, although previous decisions of this [c]ourt have extended *Leon* to the context of wiretaps") (collecting cases); *United States v. Vasconcellos*, 658 F. Supp. 2d 366, 383 (N.D.N.Y. 2009) ("district courts in this Circuit have applied *Leon* to state wiretap evidence) (collecting cases); *Funderburk*, 492 F. Supp. 2d at 240-41 ("[a]lthough the Second Circuit has yet to determine whether *Leon's* good faith exception applies to electronic surveillance such as the intercept orders in this case, other circuits, as well as district courts within the Second Circuit, have so held") (collecting cases).

Bailey's reliance on *United States v. Spadaccino*, 800 F.2d 292, 296 (2d Cir. 1986), is misplaced.  (Docket # 111 at 33).  In *Spadaccino*, the Second Circuit refused to apply the good faith exception where state investigators failed to comply with Connecticut state wiretap law.  *United States v. Spadaccino*, 800 F.2d at 295.  In this case, by contrast, the

challenged violation is not one of state law; rather, the salient question is the existence of probable cause to support the wiretap.  Under such circumstances, the admissibility of evidence in this federal prosecution is "governed by federal law even if the underlying investigation was conducted exclusively by state officials[,]" and *Leon's* good faith exception should apply to the wiretap at issue in this case.  *See United States v. Jackson*, 493 F. Supp. 2d 592, 604 (W.D.N.Y. 2006); *see also United States v. Vasconcellos*, 658 F. Supp. 2d at 382-82 (applying *Leon* to state wiretap evidence).

In *Leon*, the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective good faith," even though the warrant itself might ultimately be found to be defective.  *United States v. Leon*, 468 U.S. 897, 918-23 (1984); *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000).  The rationale underlying this good faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."  *United States v. Leon*, 468 U.S. at 919.

The Court in *Leon* identified four situations in which the good faith exception is inapplicable.  Specifically, an executing officer's reliance on a search warrant will not be deemed to have been in good faith:

(1)   where the issuing magistrate has been knowingly misled;

(2)   where the issuing magistrate wholly abandoned his or her judicial role;

(3)   where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and

(4)  where the warrant is so facially deficient that reliance upon it
is unreasonable.

*Id.* at 923; *see United States v. Cancelmo*, 64 F.3d at 807 (citations omitted).

Bailey maintains that the good faith exception should not apply in this case because Judge Dinolfo was knowingly misled or wholly abandoned his judicial role, the warrant was facially insufficient, and Moses's affidavit was so lacking in probable cause that reliance upon it was unreasonable.  (Docket # 111 at 38).  However, as discussed at length above, I find nothing in the record that supports the conclusion that Moses intentionally or knowingly included false information in his affidavit in order to mislead Judge Dinolfo and, in any event, I conclude that any misstatements contained in the affidavit were not material to the probable cause finding.  Further, nothing that Bailey has proffered supports a suggestion that Judge Dinolfo abandoned his judicial role when he issued the warrant.  Finally, for the reasons explained above, it cannot be said that the application was so lacking in indicia of probable cause that the officers' reliance upon it was unreasonable.  For these reasons, I recommend that Bailey's motion to suppress the wiretap evidence be denied.

## CONCLUSION

Further, for the reasons stated above, I recommend that the district court deny Bailey's motion to suppress wiretap evidence.  (Docket ## 111, 119).


                                                          *s/Marian W. Payson*
                                                  MARIAN W. PAYSON
                                               United States Magistrate Judge

Dated: Rochester, New York
         October 17, 2016

40

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　*s/Marian W. Payson*
　　　　　　　　　　　　　　　　　　　　　MARIAN W. PAYSON
　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

Dated: Rochester, New York
　　　　October 17, 2016

---

[6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).